IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2018 Term

_____

No. 18-0218

_____

FILED

**November 13, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel. KATIE FRANKLIN,
Petitioner

v.

HONORABLE R. CRAIG TATTERSON,
Judge of the Circuit Court of Jackson County; and
CATHY BROWN,
Respondents

_____

ORIGINAL PROCEEDING IN PROHIBITION

WRIT GRANTED

_____

Submitted: October 24, 2018
Filed: November 13, 2018

Patrick Morrisey
Attorney General
Lindsay S. See
Solicitor General
Charleston, West Virginia

Katie Franklin, Esq.
Jackson County Prosecuting Attorney
Ripley, West Virginia
Counsel for Petitioner

John W. Alderman, III, Esq.
Law Offices of John W. Alderman
Charleston, West Virginia
Counsel for Respondent Cathy Brown

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "Prohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for [a petition for appeal] or certiorari."  Syllabus Point 1, *Crawford v. Taylor*, 138 W. Va. 207, 75 S.E.2d 370 (1953).

2.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression.  These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue.  Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight."  Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

3.     "The decision of whether to admit evidence of compromise offers for a purpose other than to 'prove liability for or invalidity of the claim or its amount,' W. Va. R. Evid. 408, is within the sound discretion of the circuit court."  Syl Pt. 7, *State ex rel. Shelton v. Burnside*, 212 W. Va. 514, 575 S.E.2d 124 (2002).

4.     Evidence of all statements made during compromise negotiations are inadmissible under Rule 408 of the West Virginia Rules of Evidence unless offered to prove an exception under the rule.  Because this Court's prior holding in Syllabus Point 3 of *Shaeffer v. Burton*, 151 W.Va. 761, 155 S.E.2d 884 (1967) has been superseded by Rule 408 of the West Virginia Rules of Evidence, it is overruled.

5.     "While testimony offered to show an unaccepted offer of compromise is incompetent and inadmissible, where it appears that such statements were made without any attempt to effect any compromise between the parties, such testimony is admissible under the well-established rule that the declaration of parties to the record against interest may be shown in evidence."  Syllabus Point 2, *Averill v. Hart & O'Farrell*, 101 W.Va. 411, 132 S.E. 870 (1926).

WALKER, JUSTICE:

Petitioner Katie Franklin, Prosecuting Attorney of Jackson County, invokes this Court's original jurisdiction seeking a writ to prohibit the Circuit Court of Jackson County from enforcing its order suppressing all evidence of text messages between Respondent Cathy Brown, the defendant in the underlying criminal case, and an accountant for the company from which she allegedly embezzled $306,000. Because it is evident that the text messages were not exchanged in the context of civil settlement negotiations, we grant the writ of prohibition and find that the circuit court committed a clear error of law in prohibiting their admission at trial.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Ms. Brown has been charged with one count of embezzlement of approximately $306,000 from Hartley Oil Company, Inc. (Hartley Oil). On October 13, 2015, Hartley Oil's accountant, Krista Bratton, discovered an alleged multi-year embezzlement scheme by Ms. Brown, another employee of the company. After an inquiry by the accountant, Ms. Brown claimed to be sick and went home. Over the next seven days, Ms. Brown and the accountant exchanged several text messages. Throughout the texts Ms. Brown expressed regret for her actions and a willingness to make amends, and asked whether Hartley Oil's owners, Rodd and Georgie Hartley, would seek criminal prosecution.

1

The circuit court characterized the text messages as follows.[1] On October 15, 2015, Ms. Brown sent a text to the accountant asking a question about payroll. After receiving the accountant's response, Ms. Brown asked "[h]ows everything else[?]" The following texts ensued:

> [Ms. Brown]: I don't think he bills in U.S. Dollars
>
> Has she got back with you
>
> [Accountant]: She is researching the amount
>
> [Ms. Brown]: I will be back to work on Monday I have a lot of personal things wrong with me
>
> I am ready to have a nervous breakdown my Meds aren't helping anymore
>
> Is that ok
>
> [Accountant]: It is but I'd like to talk about what's going on.
>
> [Ms. Brown]: With me
>
> [Accountant]: Yes mam, you've got me worried
>
> [Ms. Brown]: Worried about what
>
> [Accountant]: You told me that you've done something and that I could guess what. I would really prefer not to guess what it is.

---

[1] As noted in the circuit court's order, the text messages contain misspellings and grammatical errors. The name of Ms. Brown's minor daughter has been redacted in accordance with Rule 40(e) of the West Virginia Rules of Appellate Procedure.

When Ms. Brown asked to talk on Monday, the accountant asked if Ms. Brown could call her "tomorrow," which "would give [her] a night to sleep on it." Ms. Brown insisted that she wanted to come in and talk with "everyone next week," and "after hours if possible." The accountant responded that she would talk to the owners of the company. These texts followed:

> [Ms. Brown]: *What did she say am I'm going to jail or are they going to work with me fir paying it back* I am worried [about my daughter,] not myself
>
> [Ms. Brown]: At this point are you just saying I quit
>
> [Accountant]: I think we need to determine how much before the decision is made. I'm still talking to Rodd and Georgie [Hartley Oil's owners].
>
> ***
>
> [Ms. Brown]: *I am so sorry for everything* I thought it was best to just go ahead and say something
>
> [Accountant]: I appreciate it. I'm trying to communicate that with Rodd too that you telling us should count for something
>
> [Ms. Brown]: lol ease do everything you can to help me *I know what I did was wrong and I wish I could take it back I am willing to pay every penny back to them I will do anything* I just don't want to ruin [my daughter's] life over something that I did I think *I can tell you the amount once I look at it* but I would really like to come in and talk. I know everyone hates me at this point that's why I would just like to say I quit so [my daughter] Don't find out she's just a child and do t need to be hurt. I know I am the one that hurt her *I would work anywhere for free just to get then their money back* I was struggling between bills. Famous for [my daughter] trying to keep her happy. *I know that is no excuse for what I did. Please don't hate me.* Please do everything you can to help me I really cinfide in you. I am telling everyone that I quit for personal

3

reasons right *now I just don't want to go to jail* but that not my choice it's up to rodd

[Accountant]:     I will call you here in a minute.

[Ms. Brown]:     Does everyone hate me. *I am so sorry*[2]


The State asserts that, after this particular exchange, Ms. Brown and the accountant spoke by telephone and Ms. Brown admitted to stealing approximately $20,000 during the 2015 calendar year. The following day, on October 16, 2015, Ms. Brown sent a text to the accountant that stated, "Krista I'm scared to death." Ms. Brown later asked about what was being said about her around the company and what the other employees knew of the situation. The accountant then assured Ms. Brown that the situation was being kept quiet and Ms. Brown's response stated "[t]hank you for being so good to me." The accountant promised Ms. Brown that she was "trying to keep everything fair." Then, Ms. Brown and the accountant had the following exchange:

[Ms. Brown]:     I'm so scared

I hate myself

[Accountant]:     Cathy, what has happened can't be changed, only going forward. No matter what happens

[Ms. Brown]:     I texted Georgie last night but she didn't respond.

I know she is really mad

[Accountant]:     I can imagine she is

---

[2] (emphasis by the State) (typographical errors in original).

4

[Ms. Brown]:     Are you keeping my Checks

[Accountant]:     The payroll ones? I don't think I can. We will work that out this afternoon.

And I'll need you to sign a termination slip.

[Ms. Brown]:     Ok

Did you say anything to him

[Accountant]:     I'm trying to go through and find everything

Ms. Brown later sent spreadsheets to the accountant which contained highlighted, circled and crossed-through items. The text exchange continues as follows:

[Ms. Brown]:     Ok all the I highlighted ones

I have a question if can I cash out my 401k and give it to the Hartleys

Can I meet you and sign the paper and get my check

Ms. Brown and the accountant then discussed a time for Ms. Brown to come to the office for a meeting. That same day, Ms. Brown sent the accountant a text that she "[j]ust pulled in" the office. Ms. Brown then signed a Hartley Oil Company, Inc. - Employee Action Form that included the handwritten statement "Admitted to embezzling" by the accountant in the Incident Information section of the form.

5

The following day, October 17, 2015, Ms. Brown sent a text including a picture of her daughter to the accountant and thanked her for "being a friend." The accountant indicated that she saw the picture on Facebook and complimented Ms. Brown's daughter. In response, Ms. Brown sent the following text message:

> [Ms. Brown]: Thank you. I am Already working on getting money together I'm selling my Durango and hoping I can get the 401 money out and I have my vacation checks.

Ms. Brown again thanked the accountant for helping her.

On October 18, 2015, Ms. Brown sent a text to the accountant asking to meet in person. Ms. Brown indicated, "[a]nd again I am so sorry." When the accountant responded, "I know Cathy," Ms. Brown responded, "I feel like you are the only friend I have right now." Ms. Brown continued to apologize in the texts.

On October 19, 2015, Ms. Brown sent a text to the accountant that she was selling her Durango, cashing in her 401(k) account and borrowing money on her house. In her text, Ms. Brown stated, "I would like to start paying some back as soon as I can if they will let me." Ms. Brown later sent her a text that stated, "[i]f you have any questions on anything I would gladly answer them for you."

On October 20, 2015, Ms. Brown again sent a text to the accountant asking about setting up a meeting with Hartley Oil's owners. When the accountant indicated neither were available, Ms. Brown sent a text stating, "[o]mg their not there I pray there

6

not somewhere pressing charges in me."  Later that day, there were texts between Ms. Brown and the accountant arranging for Ms. Brown to call her.

Ms. Brown continued texting with the accountant on October 22, 25 and 26 and November 11, 12, 19 and 20.  In those texts, they discussed Ms. Brown providing more information to the accountant, including discussions about meeting at the Ripley Park and Ride so that Ms. Brown could provide documents.

Prior to the trial on the embezzlement charge, the State filed a notice of intent to introduce the string of text messages from October 15, 2015 to November 20, 2015. After briefing by the parties, the circuit court entered an order on August 3, 2017, which denied admission of the text messages.  The court found that Rule 408 of the West Virginia Rules of Evidence precluded their admission at trial.  Rule 408 provides that:

**Compromise offers and negotiations.**

(a)  *Prohibited Uses.*  Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim, the liability of a party in a disputed claim, or to impeach by a prior inconsistent statement or a contradiction:

(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim.

(b) *Exceptions.*  This rule does not require the

7

exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

In so ruling, the circuit court found that Rule 408 is not limited to civil proceedings, but also applies to criminal proceedings by virtue of West Virginia Rule of Evidence Rule 101(a), which instructs that "*these rules apply to proceedings in the courts of this State. . . .*"[3] The circuit court also relied upon *United States v. Davis*,[4] which the court found to be factually analogous to the text messages in the case at hand, and determined that they were made in an "*attempt to compromise and settle the matters that gave rise to the Indictment.*"[5] In prohibiting the admission of the text messages, the circuit court stated:

> Defendant expressed that she "just [doesn't] want to go to jail," is concerned about Hartley Oil executives' planned courses of action regarding the allegations against her, and offers her 401K and other monies so that no charges will be brought against her.

On March 14, 2018, the State filed a petition for a writ of prohibition to prohibit the circuit court from enforcing its order suppressing all evidence of text messages

---

[3] (emphasis added).

[4] 596 F.3d 852 (D.C. Cir. 2010).

[5] (emphasis added).

between Ms. Brown and Hartley Oil's accountant. After Ms. Brown filed a response, this Court issued a rule to show cause by corrected order entered May 9, 2018.

## II. STANDARD OF REVIEW

The general standard for issuance of a writ of prohibition is set forth in West Virginia Code § 53-1-1 (2016), which states that "[t]he writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not [sic] jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." This Court has held that "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for [a petition for appeal] or certiorari."[6] With respect to the standard, this Court has established five factors to be considered:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a

_____

[6] Syl. Pt. 1, *Crawford v. Taylor*, 138 W. Va. 207, 75 S.E.2d 370 (1953).

9

useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.[7]

"The decision of whether to admit evidence of compromise offers for a purpose other than to 'prove liability for or invalidity of the claim or its amount,' W. Va. R. Evid. 408, is within the sound discretion of the circuit court."[8] Thus, our general rule provides that "[p]rohibition is ordinarily inappropriate in matters involving a trial court's pretrial ruling on . . . the admissibility of evidence."[9] However, in circumstances like the present case, when the State has no other adequate means to obtain the desired relief and this issue is not one that would be correctable on appeal, this Court has entertained a petition for a writ of prohibition.[10] With these standards in mind, we consider the parties' arguments.

---

[7] Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

[8] Syl. Pt. 7, *State ex rel. Shelton v. Burnside*, 212 W. Va. 514, 575 S.E.2d 124 (2002).

[9] *Policarpio v. Kaufman*, 183 W. Va. 258, 261, 395 S.E.2d 502, 505 (1990).

[10] *See State ex rel. Plants v. Webster*, 232 W. Va. 700, 708, 753 S.E.2d 753, 761 (2012).

### III. DISCUSSION

The State argues that although Rule 408 may be applicable in criminal proceedings, the text messages here were not statements made for civil settlement purposes. Rather, they were intended to affect a criminal proceeding and thus, Rule 410 of the West Virginia Rules of Evidence applies. Rule 410 addresses the admissibility of criminal plea negotiations in civil and criminal trials. Pursuant to Rule 410(a)(4), criminal plea negotiations are not admissible at trial if "an attorney for the prosecuting authority" is a party to the negotiations, which was not the case here. Therefore, the State argues that this Court should prohibit the circuit court from enforcing its order suppressing all evidence of text messages between Ms. Brown and an accountant for the employer from which she allegedly embezzled $306,000.

The State notes that the texts referenced solely Ms. Brown's fear of going to jail and the potentiality for criminal charges. Throughout the text messages, the State asserts that there is no statement that references a civil negotiation or even a concern for any form of civil remedy; to the contrary, Ms. Brown made it clear in the texts that she would sell her personal property and assets to do whatever she needed to do in order to avoid criminal charges. The State argues that the nature of Ms. Brown's text messages distinguishes her situation from *Davis*, where the D.C. Circuit found that the defendant was

11

engaged in civil settlement negotiations and did not have any awareness of a potential criminal proceeding.[11]

The State contends that a Fourth Circuit case, *United States v. Peed*,[12] is more analogous to the present circumstances than *Davis*. In *Peed*, the Fourth Circuit found that the district court did not abuse its discretion in admitting a secretly recorded conversation during which a criminal defendant attempted to pay a victim in exchange for dropping the charges. The Fourth Circuit agreed with the district court's characterization of the defendant's statements as an attempt to avoid criminal prosecution, not as an effort to resolve a civil claim, which is the purpose behind Rule 408.[13]

Alternatively, the State claims that even if the text message exchanges were civil settlement negotiations, the texts would still be admissible under this Court's decision in *Shaeffer v. Burton*.[14] In Syllabus Points 2 and 3 of *Shaeffer*, this Court held:

> 2.    'While testimony offered to show an unaccepted offer of compromise is incompetent and inadmissible, where it appears that such statements were made without any attempt to effect any compromise between the parties, such testimony is admissible under the well-established rule that the declaration of parties to the record against interest may be shown in

---

[11] 596 F.3d at 861.

[12] 714 F.2d 7 (4th Cir. 1983).

[13] *Id.* at 9-10.

[14] 151 W.Va. 761, 155 S.E.2d 884 (1967).

evidence.' Point 2, syllabus, *Averill v. Hart & O'Farrell*, 101 W.Va. 411, [132 S.E. 870 (1926)].

> 3.    The determining factor as to whether a statement is in the nature of a settlement proposal or offer, so as to exclude it from evidence, is whether the form of the statement is explicit or absolute, and if its purpose is to declare a fact really to exist rather than to concede a fact hypothetically in order to effect a settlement, the statement is admissible.[15]

The State argues that while this Court decided *Shaeffer* before the adoption of the West Virginia Rules of Evidence, the Court favorably cited the *Shaeffer* decision in *SER Richmond American Homes of W.Va., Inc. v. Sanders*.[16]  Applying the holdings of *Shaeffer* to this case, the State argues that not only did Ms. Brown make various admissions of actual guilt—not simply hypothetical guilt—but she also provided copies of spreadsheets where she highlighted accounting entries relating to money she specifically admits to embezzling.  Therefore, the State argues that Ms. Brown's text messages, along with the spreadsheets, constitute direct, express, and unconditional admissions of stated facts and show an intention to admit liability for at least part of the crime charged.

To the contrary, Ms. Brown argues that the circuit court properly relied on *Davis*.  First, Ms. Brown argues that the text message exchanges occurred in the context of and contemporaneously with settlement negotiations to resolve Hartley Oil's claim against

---

[15] *Id.* at 761, 155 S.E.2d at 886.

[16] 226 W.Va. 103, 117, 697 S.E.2d 139, 153 (2010).

13

her and, therefore, Rule 408 applies. The first set of text messages indicated that Ms. Brown allegedly asked Hartley Oil's accountant if "they are going to work with me fir paying it back." Ms. Brown asserts that the accountant proceeded to indicate that the amount needed to be determined and she was still talking to the company's owners. The next set of text messages indicated that Ms. Brown was willing to pay Hartley Oil, would do everything in order to resolve the matter, and wanted to calculate the amount owed in order to compensate the company. Ms. Brown asserts that she and the accountant sought to establish the amount of the disputed claim. She contends that she expressed her desire to make financial amends rather than confessing to a crime.

Ms. Brown claims that, at that time, Hartley Oil retained counsel to evaluate its civil claim and the potential for reaching a settlement. While Hartley Oil ultimately filed a civil action against Ms. Brown to recover monetary damages for the alleged embezzlement, Ms. Brown's attorney engaged in negotiations with a lawyer for Hartley Oil prior to the filing of that action. On November 17, 2015, Ms. Brown sent $17,135 to Hartley Oil. Ms. Brown asserts that there were also e-mails titled "settlement negotiations" between her and Hartley Oil's attorneys in an attempt to reach a settlement. Ms. Brown contends that when she and Hartley Oil failed to reach a settlement in 2016, the company filed its action. Therefore, Ms. Brown argues that the circuit court properly found that the text messages were inadmissible because they constituted settlement negotiations under Rule 408.

14

The threshold question this Court must consider is whether Rule 408 applies to the text messages between Ms. Brown and the accountant at Hartley Oil. To establish that Rule 408(a) applies to a particular document or information, a party must make a substantial showing that it was, in fact, part of civil settlement negotiations. In *Miller v. Allman*,[17] we recently discussed the intended application of Rule 408:

> This rule "addresses the admissibility of evidence *originating in offers to compromise or settle civil suits*." 1 Palmer, et al., Handbook on Evidence § 408.02, at 479. There are two provisions set out under Rule 408(a) that prohibit evidence concerning settlements. "Rule 408(a)(1) covers offers or acceptance of offers to compromise, [and] Rule 408(a)(2) covers any statement made during compromise negotiations." *United States v. Dish Network, L.L.C.*, No. 09-3073, 2015 WL 9164665, at *3 (C.D. Ill. signed December 15, 2015). It has been noted that "Rule 408 statements made in settlement negotiations are only excludable under the circumstances protected by the rule." 1 Palmer, et al., Handbook on Evidence § 408.02, at 479. The exceptions to the prohibitions of Rule 408(a) are found in Rule 408(b). . . . It has been recognized that "[t]his is an illustrative, not an exhaustive, list of the many exceptions to the Rule 408 prohibition." *United States v. J.R. LaPointe & Sons, Inc.*, 950 F.Supp. 21, 23 (D. Me. 1996).[18]

In making a determination of whether Rule 408 applies, a court must look at the totality of the circumstances.[19] "In determining whether prelitigation discussions between parties constitute settlement negotiations requires a trial court to look at the totality

---

[17] 240 W. Va. 438, 813 S.E.2d 91 (2018) (Walker, J. dissenting on other grounds).

[18] 240 W. Va. at __, 813 S.E.2d at 104. (emphasis added).

[19] 1 Palmer, et al., Handbook on Evidence § 408.03[1] at 482 (citing *Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1241 (7th Cir. 1995).

of the circumstances, carefully reviewing the substance of the communications and the timing of its occurrence."[20]

While litigation need not have actually commenced in order for Rule 408 to apply, under Rule 408(a) there must be a prior dispute before excluding evidence of an offer to compromise. "Courts generally recognize a preexisting dispute when an offer is made after some legal action had been taken or threatened, i.e., a threat to bring suit on a claim, delivery of a claim to an attorney for legal action, or the actual filing of a suit."[21] Rule 408, however, does not apply to settlement offers made before the plaintiff has asserted a claim or threatened to assert a claim against the defendant.

While the State argues that even if the text message exchanges were civil settlement negotiations, the texts would still be admissible under this Court's decision in *Shaeffer v. Burton*, it is clear that our prior holding in Syllabus Point three of *Shaeffer* has been superseded by Rule 408. In *Shaeffer*, this Court held that if the purpose of a statement was to declare the existence of a fact, rather than to concede a fact hypothetically in order

---

[20] *Id.*

[21] 1 Palmer, et al., Handbook on Evidence § 408.03[1] at 483-84 (citing *NMB Air Operations Corp. v. McEvoy*, 1999 U.S. App. LEXIS 22991 (9th Cir. Sept. 16, 1999) ("in order for a compromise to be inadmissible at trial under Rule 408, the underlying claim must be disputed as to either validity or amount"); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898 (2d Cir. 1997); *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage Dist.*, 50 F.3d 476 (7th Cir. 1995).

16

to effect settlement, the statement was admissible.[22]  Thus, before the adoption of Rule 408, "[a]n admission of fact was independent of the compromise and, therefore, admissible unless the admission was stated hypothetically, expressly stated to be without prejudice, or so interwoven with the compromise offer as to be inseparable from it."[23]  Recognizing that the common law rule in *Shaeffer* was difficult to apply, thus making it susceptible to contradictory and inequitable results, the Handbook on West Virginia Evidence explains that Rule 408 supersedes *Shaeffer*:

> Rule 408(a) avoids the problems caused by *Shaeffer*, by implicitly placing the words *without prejudice* after every statement made during compromise negotiations, thus rendering such statements inadmissible.  This expansion of the rule is consistent with the privilege theory that excludes offers of compromise under the notion of encouraging settlements at the risk of losing valuable evidence. *Now, contrary to common law, evidence of all statements made during compromise negotiations are inadmissible unless offered to prove an exception under Rule 408(b).*[24]

Agreeing with this interpretation of Rule 408(a), the Fourth Circuit has also determined that the rule is broader than the common law exclusionary rule in many jurisdictions, and excludes from evidence all statements made in the course of settlement

---

[22]  *See Shaeffer* at Syl. Pt. 3.

[23]  1 Palmer, et al., Handbook on Evidence § 40.8.03[4] at 489-90 (*citing Shaeffer*, 151 W. Va. 761, 155 S.E.2d 884).

[24]  *Id.* (emphasis added).

17

negotiations.[25]  Accordingly, we hold that contrary to our prior common law, evidence of all statements made during compromise negotiations are inadmissible under Rule 408 of the West Virginia Rules of Evidence unless offered to prove an exception under the rule. Because this Court's holding in Syllabus Point 3 of *Shaeffer* has been superseded by Rule 408 of the West Virginia Rules of Evidence, it is overruled.[26]  Thus, *Shaeffer* lends no guidance to our determination of this matter.

While Rule 408(a) may in fact be applicable to criminal proceedings, the issue of whether Rule 408(a) actually applies to criminal prosecutions has not yet been resolved by this Court.[27]  Regardless, it is unnecessary for the Court to decide that issue in this particular case because it is evident that the text messages were not part of a civil settlement negotiation under Rule 408.

---

[25] *Id.* (citing *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652 (4th Cir. 1988)) (internal footnotes and citations omitted).

[26] As this Court reiterated in Syllabus Point 1 of *Reed v. Wimmer*, 195 W.Va. 199, 465 S.E.2d 199 (1995):

> "The West Virginia Rules of Evidence remain the paramount authority in determining the admissibility of evidence in circuit courts.  These rules constitute more than a mere refinement of common law evidentiary rules, they are a comprehensive reformulation of them."  Syllabus Point 7, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

[27] *See* 1 Palmer, et al., Handbook on Evidence § 408.03[3] at 488.

18

The text messages undoubtedly convey that these discussions were not an attempt to compromise or settle a civil dispute. Rather, Ms. Brown was clearly worried about whether the owners were going to press charges against her and she wanted to pay back what she owed them in an effort to avoid criminal prosecution. This conclusion is supported by the circuit court's analysis, which included this observation:

> Defendant expressed that she "just [doesn't] want to go to jail," is concerned about Hartley Oil executives' planned courses of action regarding the allegations against her, and offers her 401K and other monies *so that no charges will be brought against her.*

And the case relied upon by the circuit court, *Davis*,[28] offers little guidance in analyzing the facts before us in this case. In *Davis*, the court addressed the application of Federal Rule of Evidence 408 in a criminal proceeding where the state had sought to introduce testimony of a telephone conversation in which the defendant, who was accused of stealing money from a national fraternity while serving as its treasurer, offered to pay back some of the money he stole from the fraternity to "make [the accusations] go away." The conversation was as follows:

> [The defendant asked – he said, 'Can we just split this $29,000 and make this situation go away? . . . . I told him that [the] amount was in excess of a hundred thousand dollars. [The defendant's] statement to me at that point was, 'I can't afford to pay that amount,' and then I told him – I said, '*Terry, if you want to do some – negotiate some kind of settlement, you need to talk to our legal counsel or our international president.*'"[29]

---

[28] 596 F.3d 852.

[29] *Id.* at 854 (emphasis added).

19

In finding that the statements were not admissible, the *Davis* court reasoned:

> *There can be no doubt that Davis offered to compromise a disputed claim.* His offer was to split the $29,000 in checks to cash he thought the fraternity had discovered. The claim "was disputed as to validity or amount," FED.R.EVID. 408(a): Davis did not confess to taking the fraternity's money; he said that he had deposited the cash checks into the fraternity's payroll account; and Hammock rejected Davis's explanation. *See Affiliated Mfrs., Inc. v. Alum. Co. of Am.*, 56 F.3d 521, 527–28 (3d Cir.1995). It is also clear that the government intended to introduce Davis's settlement offer in order to prove Davis's guilt, or in the words of Rule 408(a), his "liability."[30]

In *Davis*, the court found that the defendant was engaged in civil settlement negotiations and did not have any awareness of a potential criminal proceeding. In contrast, the State correctly contends that in this case there is no statement that references a civil negotiation or even a concern for any form of civil remedy. To the contrary, Ms. Brown's texts make it clear that she would sell her personal property and assets to do whatever she needed to do in order to avoid criminal charges.

Further, we are not inclined to follow the reasoning applied by the court in *Davis*. When we examine the facts in that case, it is apparent that the defendant was, as here, not conversing with a person who had authority to enter into compromise/settlement negotiations, an implicit requirement of Rule 408. Thus, while the defendant in *Davis* may

---

[30] *Davis*, 596 F.3d at 858-59 (emphasis added).

20

have made an offer to compromise, as evidenced by the new treasurer's comments, the offer was not made to a person with any authority to settle the claim.

Additionally, the claim in *Davis* "was disputed as to validity or amount" under Federal Rule of Evidence 408(a). The court found that Davis did not confess to taking the fraternity's money; he said that he had deposited the cash checks into the fraternity's payroll account; and Hammock rejected Davis's explanation. Here, Ms. Brown admitted her wrongdoings in her text messages and offered to pay back the full amount she owed:

> [Ms. Brown]: lol ease do everything you can to help me *I know what I did was wrong and I wish I could take it back I am willing to pay every penny back to them I will do anything* I just don't want to ruin [my daughter's] life over something that I did I think *I can tell you the amount once I look at it* but I would really like to come in and talk. I know everyone hates me at this point that's why I would just like to say I quit so [my daughter] Don't find out she's just a child and do t need to be hurt. I know I am the one that hurt her *I would work anywhere for free just to get then their money back* I was struggling between bills. Famous for [my daughter] trying to keep her happy. *I know that is no excuse for what I did. Please don't hate me.* Please do everything you can to help me I really confide in you. I am telling everyone that I quit for personal reasons right now *I just don't want to go to jail* but that not my choice it's up to rodd[31]

Because a dispute as to the amount and validity of the claim is a foundational requirement for Rule 408's application, payment of the full amount demanded or

---

[31] (emphasis by the State).

acknowledgement of the debt has been held not to constitute a compromise offer and is not protected under Rule 408. In *Carmichael v. Government of the Virgin Islands*,[32] a court determined that when a defendant was initially confronted by her employer regarding some missing funds and the defendant readily admitted to taking the money to pay her creditors and agreed to repay the full amount demanded, her conduct had not come within Rule 408 due to lack of valuable consideration. Specifically, the court found:

> [The defendant's] attempt to bring her restitution payment within the rule must also fail for lack of consideration because, having taken CAC's funds for her own use, any agreement to repay those funds, which she already had a duty to do, cannot constitute valuable consideration under Rule 408. Therefore, the trial court did not abuse its discretion in admitting evidence of those payments.[33]

This case is also analogous to *Peed*,[34] where a secretly-recorded telephone conversation between a defendant and an owner of a valuable doll collection was held admissible at trial despite the defendant's contention that the statement, in which the defendant offered to return the dolls in return for dropping the criminal charges, constituted an offer to compromise a civil claim. During the telephone conversation, the defendant stated, "You're the one that pressed the charges, will you drop the charges? . . . If you want

---

[32] No. CRIM.A.2002/164, 2004 WL 3222756 (D.Vi. Nov. 29, 2004).

[33] *Id.* at *8.

[34] 714 F.2d 7.

22

the dolls back and but [sic] I want your word that everything will be dropped."[35]

The Fourth Circuit, refusing to characterize the defendant's statement as an offer to compromise a civil claim, stated:

> There was no civil suit pending at the time this conversation took place. [The defendant's] jargon ("drop the charges") implies concern over criminal prosecution. These were not negotiations aimed at settling a civil claim, negotiations that the policy behind Rule 408 seeks to encourage. Nor were [the defendant's] statements followed up by any attempt on [the defendant's] part to obtain money or resources for achieving a settlement with [the complainant].[36]

Thus, the court determined that the defendant's statements were an attempt to avoid criminal prosecution under Rule 408(b), and, accordingly, the evidence was held admissible.[37]

While Ms. Brown did eventually follow up with an attempt to obtain money or resources for achieving an eventual civil settlement with Hartley Oil, the fact remains that, like *Peed*, the tenor of Ms. Brown's text messages with the company's accountant

---

[35] *Id.* at 9.

[36] *Id.*

[37] *Id.*

evidences that these early discussions were not part of a civil settlement negotiation, but rather simply conveyed her concerns about criminal prosecution.[38]

And, as we stated above, Rule 408 does not apply to settlement offers made before the plaintiff has asserted a claim or has threatened to assert a claim against the defendant.[39] Here, the first evidence in the record allegedly demonstrating the existence of, or a threat by, Hartley Oil to bring a civil claim, is a November 5, 2015 email from John Alderman, Ms. Brown's counsel, to Ancil Ramey, Hartley Oil's counsel, wherein he conveys that Ms. Brown was planning to pay back the debt owed. However, even assuming that civil settlement negotiations had begun at some point during the course of these text conversations, looking at the totality of the circumstances, when we examine the nature of the comments made by Ms. Brown and the employee with whom her text messages were

---

[38] This case is also factually analogous to a Tennessee appellate court case, *State v. Ward*, No. 2008-02389-CCA-R3-CD, 2010 WL 3516206 (Tenn. Crim. App. Sept. 8, 2010). In *Ward*, a defendant was convicted of stealing aluminum pipes from a nursery and the trial court denied his motion to exclude a statement he made to the manager of the nursery under Rule 408. Following the theft, the defendant asked the manager "Can I pay you for these pipes that's been cut up and forget about it?" The appellate court held that the statement was admissible under the exception to Rule 408 for proving an effort to obstruct a criminal investigation or prosecution. *Id*. at *8. While we do not go so far as to find that Ms. Brown's offer was an effort to obstruct a criminal investigation, like *Peed*, we conclude that her statements do not "rise to the dignity of an offer to compromise a civil claim for purposes of [Rule] 408." *Peed*, 714 F.2d at 9.

[39] "Courts generally recognize a preexisting dispute when an offer is made after some legal action had been taken or threatened, i.e., a threat to bring suit on a claim, delivery of a claim to an attorney for legal action, or the actual filing of a suit." 1 Palmer, et al., Handbook on Evidence § 408.03[1] at 483-84.

exchanged, it is evident that these text messages were not aimed at settling a civil claim, the negotiations that the policy behind Rule 408 seeks to encourage. Accordingly, we find that the circuit court committed a clear error of law in prohibiting their admission at trial.

As this Court has made clear:

> While testimony offered to show an unaccepted offer of compromise is incompetent and inadmissible, where it appears that such statements were made without any attempt to effect any compromise between the parties, such testimony is admissible under the well-established rule that the declaration of parties to the record against interest may be shown in evidence.[40]

Although prohibition is ordinarily inappropriate in matters involving a trial court's pretrial ruling on the admissibility of evidence, when the State has no other adequate means to obtain the desired relief and the issue is not one that would be correctable on appeal, this Court has entertained a petition for a writ of prohibition.[41] Because the circuit court's ruling would effectively prohibit all of the evidence surrounding these statements, including testimony from the accountant regarding her discussions with Ms. Brown, it would impede the State's ability to secure a valid criminal conviction in this case. Accordingly, we grant the State's request for extraordinary relief.

---

[40] Syl. Pt. 2, *Averill v. Hart & O'Farrell*, 101 W.Va. 411, 132 S.E. 870 (1926).

[41] *See State ex rel. Plants v. Webster*, 232 W. Va. at 708, 753 S.E.2d at 761.

## IV. CONCLUSION

For these reasons, we grant the requested writ and prohibit the circuit court from enforcing its August 3, 2017 order denying admission of these text messages.

Writ granted.